# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DENNIS L. MUNDEN and SHERRILYN L. MUNDEN, husband and wife, residing in Bountiful, Utah, | Case No. 4:19-cv-00112-DCN |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| vs. | |
| STEWART TITLE GUARANTY COMPANY, a Texas surety; and CHICAGO TITLE INSURANCE COMPANY, an Illinois surety, | |
| Defendants. | |

## I.    INTRODUCTION

Pending before the Court are Defendant Chicago Title Insurance Company's Motion to Dismiss (Dkt. 8), Plaintiffs Dennis and Sherrilyn Munden's  Motion for Partial Summary Judgment (Dkt. 27), and Defendant Stewart Title Guaranty Company's Motion for Summary Judgment (Dkt. 34). On January 24, 2020, the Court held oral argument and took the motions under advisement. Upon review, and for the reasons set forth below, the Court finds good cause to GRANT Defendant Chicago Title's Motion to Dismiss, DENY Plaintiffs' Motion for Partial Summary Judgment and GRANT Defendant Stewart Title's Motion for Summary Judgment.

## II.    BACKGROUND

On January 17, 2006, Bannock County passed County Ordinance 2006-1 and

subsequently published it on January 24, 2006. Ordinance 2006-1 designated multiple roads and trails—including the Upper Garden Creek road at issue here—as part of the "Scout Mountain Loop snowmobile trail." Bannock County, Idaho Ordinance No. 2006-1, Dkt. 27-3, at 36–37. It prohibited vehicular traffic, except for snowmobile traffic, on the designated roads and trails during the winter season.

On or about January 18, 2012, the Mundens purchased property in Bannock County, Idaho, consisting of approximately 768 acres of agricultural land ("North Garden Creek property"). The Mundens obtained an "Owners' Policy of Insurance" from Stewart Title Guaranty Company ("Stewart Title") in the amount of $600,000 for indemnification and defense against any covered claims against title to the North Garden Creek property.

On or about August 14, 2014, the Mundens purchased an additional 660 acres of agricultural land in Bannock County, Idaho ("South Garden Creek property"). The Mundens obtained an "Owners' Policy of Insurance" from Chicago Title Insurance Company ("Chicago Title") in the amount of $406,700 for indemnification and defense against any covered claims against title to the South Garden Creek property.

On January 8, 2019, Bannock County amended Ordinance 2006-1 by passing Ordinance 2019-01. Under Ordinance 2006-1, the designated snowmobile roads and trails, including the Upper Garden Creek roads, were closed from December 15 to April 15 each year to non-snowmobile vehicles. Under the amended Ordinance 2019-01, "said snowmobile trails shall be closed . . . at the discretion of the County Public Works Director." *Id*. at 40. Ordinance 2019-01 went into effect after it was published on January 13, 2019. *Id*. at 40–41.

The Upper Garden Creek road subject to closure under both Ordinance 2006-1 and 2019-01 runs through the Mundens' North Garden Creek and South Garden Creek properties. The Mundens stated in oral argument that they can access their South Garden Creek property through another road but allege that they can only access their North Garden Greek property via the Upper Garden Creek Road, which they refer to as the "Garden Creek Road."

After Bannock County passed Ordinance 2019-1, the Mundens filed an action in Idaho State District Court of the Sixth Judicial District for the County of Bannock, Case No. CV03-19-00217 (hereinafter referred to as the "Underlying Action") seeking an injunction and other relief against Bannock County for its actions affecting the use of their property. The state district court issued a Temporary Restraining Order on January 24, 2019. The state district court then held a hearing on February 4, 2019 on whether to extend the restraining order, during which Bannock County made verbal counter-claims against the Mundens.

On February 7, 2019, the Mundens sent a notice of claim to both Stewart Title and Chicago Title (collectively "Defendants") that they must defend and indemnify the Mundens from the claims being made by Bannock County on the grounds the claims affected the value and marketability of the Mundens' titles. Both Stewart Title and Chicago Title denied the Mundens' notice of claims.

On March 11, 2019, Bannock County filed counterclaims in the Underlying Action. Three of Bannock County's counterclaims are based on its contention that the road through Mundens' property is a public road of record. The Underlying Action is still pending, and

Mundens allege they have incurred costs in defending against the action and suffered losses from the restrictions placed by Bannock County which remain pending resolution of the case. The Mundens do not concede that Garden Creek Road was a public road prior to their purchase of the property.

On April 4, 2019, the Mundens filed their diversity Complaint for Declaratory Judgment in federal court under 28 U.S.C. § 1332. The Mundens are citizens in Utah, Stewart Title is a surety registered in Texas, and Chicago Title is a surety registered in Illinois. The real property at issue is in Idaho. The Mundens assert four claims: a declaratory relief claim, a defense and prosecution of action claim, an indemnification claim, and a breach of contract claim. The amount in controversy exceeds $75,000.

On May 8, 2019, Chicago Title filed the pending Motion to Dismiss. Dkt. 8. On July 11, 2019, the Mundens filed the pending Motion for Partial Summary Judgment, also styled as a response to Chicago Title's Motion to Dismiss. Dkt. 27. On August 14, 2019, Stewart Title filed the pending Motion for Summary Judgment. Dkt. 34.

### III.  APPLICABLE LEGAL STANDARD FOR CHICAGO TITLE'S MOTION TO DISMISS

In response to Chicago Title's motion to dismiss, Plaintiffs filed a brief that served both as opposition to Chicago Title's motion to dismiss and a motion for partial summary judgment. Plaintiffs attached the Declaration of Sherrilyn Munden and Nathan Olsen—which included other documents as exhibits—to their brief. Accordingly, Chicago Title argues under Federal Rule of Civil Procedure 12(d) that its motion to dismiss should be evaluated under the standard imposed by Federal Rule of Civil Procedure 56.

Under the Federal Rules of Civil Procedure, "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). If the motion to dismiss is construed as a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* However, "when a party is represented by counsel, not only may formal notice be unnecessary, a 'represented party who submits matters outside the pleadings to the judge and invites consideration of them has notice that the judge may use them to decide a motion originally noted as a motion to dismiss, requiring its transformation to a motion for summary judgment.'" *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 477 (9th Cir. 1998) (internal quotation marks and citations omitted).

Plaintiffs knew when they filed their response to Chicago Title's 12(b)(6) motion that the Court would have to construe the motion as one for summary judgment because Plaintiffs were the ones who submitted documents outside the Complaint in their response. The parties had reasonable notice that the motion would be treated as one for summary judgment under Rule 56 and an opportunity to present all the material pertinent to the motion. Further, all parties agreed during oral argument that Chicago Title's motion should be converted into a motion for summary judgment.

Pursuant to Rule 12(d), the Court will review Chicago Title's motion to dismiss as if it were a motion for summary judgment.

## IV.    LEGAL STANDARD

Pending before the Court are three cross-motions for summary judgment. Summary

judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the Court must "view[ ] the facts in the non-moving party's favor." *Id*. To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id*. (citation omitted).

Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

When cross-motions for summary judgment are filed, a court must "rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (internal quotation marks and citations omitted). In doing so, it must independently search the record for factual

disputes. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment—where all parties essentially assert that there are no material factual disputes—does not end a court's responsibility to determine whether disputes as to material fact are present. *Id.*

## V.   DISCUSSION

All of the pending cross-motions for summary judgment concern the question of whether the title insurers, as a matter of law, have a duty to indemnify or defend Plaintiffs against claims in the Underlying Action relating to Bannock County's ordinance restricting winter access to Garden Creek Road. Before turning to the legal merits of the motions for summary judgment, the Court first reviews the purpose of title insurance.

### A.  The Purpose of Title Insurance

Title insurance "is the certification or guarantee of title or ownership, or insurance of owners of property or others having an interest therein or liens or encumbrances thereon, against loss by encumbrance, or defective titles, or invalidity, or adverse claim to title." Idaho Code § 41-508(1). "The purpose of title insurance is to protect a transference of real estate from the possibility of a loss through defects that may cloud the title." *Brown's Tie & Lumber Co. v. Chicago Title Co. of Idaho*, 764 P.2d 423, 427 (Idaho 1988) (quoting 9 Appleman, Insurance Law and Practice § 5201, pp. 8–9 (1981)).

Policyholders may hold the "reasonable expectation" that title insurance will protect them "against the defects in [their] title which appear of record." *Brown's Tie*, 764 P.2d at 427 (quoting 9 Appleman, at pp. 8–9). However, they should hold no expectation that title insurance will guarantee the success of how they intend to use the property, e.g., for its

agricultural use and productivity. *See Brown's Tie*, 764 P.2d at 427 ("The business success is not what has been insured, only the title."). Additionally, "contracts for title insurance and policies are the source of the duties between the parties, not negligence principles," so policyholders cannot assert tort claims against title insurers based on the policy language. *Id.* at 425.

Ultimately, title insurance guarantees the status of the property title based on what is recorded in the record as of the date of the policy. Examples of things in the record affecting a specific property title are easements, liens, encumbrances, etc.

## B. Mundens' Motion for Partial Summary Judgment

The Court first reviews the Mundens' motion for partial summary judgment. The Court will be particularly clear here: its decision and analysis of the facts and law in the case before it has no bearing on the outcome of the Underlying Action in the state court. Nothing the Court states in this case should be taken as a comment on the validity or invalidity of the claims before the state court.

In its case against the Mundens, Bannock County is arguing that Garden Creek Road has been a public highway pursuant Idaho Code section 40-202 since 1963, well before Mundens' purchase of the properties at issue. Dkt. 38, at 11–12. According to Bannock County, Garden Creek Road was listed as a public county road on the Idaho Department of Transportation maps as far back as 1958 and included on the official County Roadmap in 2013 and 2018. *Id*. at 12.

Idaho Code section 40-202 sets forth the statutory requirements for determining whether a public highway exists. Under the statute, a public road may be acquired by

prescription if (1) the public uses the road for a period of five years, and (2) the road is maintained at the expense of the public. Idaho Code § 40–202(3). Once the public road has been established, the public has the "[the] right to use[ ] the land over which the road runs for highway purposes . . . ." *E. Side Highway Dist. v. Delavan*, No. 45553, 2019 WL 6724484, at *13 (Idaho Dec. 11, 2019) (internal quotations omitted) (alterations in original). The state government "does not own the underlying land upon which the highway is located; rather, the [government] merely has an easement over the road for the benefit of the public." *Id*.

In *Ada County Highway District v. Total Success Investments, LLC*, the Idaho Supreme Court held that "property owners have notice of easement from the statute itself, Idaho Code section 40–202(3), which provides that highways include those used and maintained by the public for five years." 179 P.3d 323, 334 (Idaho 2008); *quoting Powers v. Canyon Cty.*, 703 P.2d 1342, 1345 (Idaho 1985) ("Our entire legal system is based upon the principle that persons are charged with constructive knowledge of the statutes and laws."). "One who purchases land expressly subject to an easement, or with notice, actual or constructive, that it is burdened with an existing easement, takes the land subject to the easement." *Halvorson v. N. Latah Cty. Highway Dist.*, 254 P.3d 497, 506 (Idaho 2011) (internal quotation marks and citations omitted).

There is no question that if Garden Creek Road was established as a public highway as of 1958, then the Mundens purchased the property subject to the easement. Further, they had would have had notice of the easement. The issue is whether Stewart Title and Chicago Title are obligated by the contract to indemnify and defend the Mundens' title in claims

relating to an easement with such notice.

The Court will grant Mundens' motion for partial summary judgment if it finds that, as a matter of law, Defendants breached their contract by failing to defend claims against the Mundens' title of properties covered by the respective title insurance policies. The Idaho Supreme Court has instructed that, "[w]hen interpreting insurance policies," courts should apply "the general rules of contract law subject to certain special canons of construction." *Clark v. Prudential Prop. & Cas. Ins. Co.*, 66 P.3d 242, 244 (Idaho 2003). Under these general rules, the Court must determine whether or not there is an ambiguity in the policy, "[b]eginning with the plain language of the insurance policy." *Id.* "Determining whether a contract is ambiguous is a question of law upon which this Court exercises free review." *Id.* at 245. "Where the policy is reasonably subject to differing interpretations, the language is ambiguous and its meaning is a question of fact." *Id.*

In resolving this question of law, the Court must construe the policy "as a whole, not by an isolated phrase." *Selkirk Seed Co. v. State Ins. Fund*, 18 P.3d 956, 959 (Idaho 2000). Generally, "because insurance contracts are adhesion contracts, typically not subject to negotiation between the parties, any ambiguity that exists in the contract 'must be construed most strongly against the insurer.'" *Farmers Ins. Co. of Idaho v. Talbot*, 987 P.2d 1043, 1047 (Idaho 1999) (quoting *Mut. of Enumclaw Ins. Co. v. Roberts*, 912 P.2d 119, 122 (Idaho 1996)). "The burden is on the insurer to use clear and precise language if it wishes to restrict the scope of coverage and exclusions not stated with specificity will not be presumed or inferred." *Clark*, 66 P.3d at 245.

"Under Idaho law and consistent with other states, an insurer's duties to defend and

indemnify are separate duties." *Hoyle v. Utica Mut. Ins. Co.*, 48 P.3d 1256, 1264 (Idaho 2002). "The duty to defend is broader than the duty to indemnify." *Id.* A "third-party's complaint [that] reveals a potential for liability that would be covered by the insured's policy" triggers the duty to defend. *Id.* The insurer must "immediately step in and defend the suit" if it determines that "an arguable potential exists for a claim covered by the policy," rather than wait for a court to determine if a duty exists. *Id.* (quoting *Kootenai County v. W. Cas. and Sur. Co.,* 750 P.2d 87, 89–90 (Idaho 1988)).

### 1. *Applicability of Covered Risks to the Underlying Action*

According to the Mundens, Bannock County's counterclaims in the Underlying Action consist of three counts that might trigger the title insurance policies: Counts I, II, and V. Dkt. 21-1, at 4–5. Count I is for a declaratory judgment that Garden Creek Road, which passes through the Mundens' property, has been a public highway since 1963 pursuant to Idaho Code section 40-202. Dkt. 23-3, at 28–29. Count II is for a declaratory judgment that Garden Creek Road has a width of fifty feet, pursuant to Idaho Code section 404-2312. *Id*. at 29. Count V is a negligence per se claim that the Mundens' negligent conduct directly and proximately caused damage to the Garden Creek Road. *Id*. at 31–32.

The title insurance policies may cover Bannock County's first two claims against the Mundens. However, it does not cover Count V, which arose due to events that occurred after the date the policy was enacted. Title insurance does not insure against tort claims. *See Brown's Tie*, 764 P.2d at 425.

The Mundens identify five types of risks under the policies' "Covered Risk" section that may trigger Defendants' duty to defend and/or indemnify the Mundens in the

Underlying Action with respect to Counts I and II. Respectively, the risks are Covered Risk 2 (defective title), Covered Risk 3 (unmarketable title), Covered Risk 4 (no right of access to and from land), Covered Risks 5 and 6 (enforcement actions under ordinances recorded in public record), and Covered Risk 8 (governmental taking). Defendants respond that even if a covered risk applies—which they dispute—the policies' exclusions make it clear that the policies expressly do not cover the Underlying Action.

The Court will first determine whether any of the cited Covered Risks is triggered before reviewing whether an exclusion applies. The Mundens' strongest argument that Bannock County's Counts I and II in the Underlying Action generate a duty to defend lies under Covered Risk 3, unmarketable title.

Both title insurance policies state, "SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS," the policies cover "after the Date of Policy, against loss or damage, . . . sustained or incurred by the insured be reason of . . . 3. Unmarketable Title." Owner's Policy of Title Insurance Issued by Stewart Title, Dkt 27-2, at 7; Owner's Policy of Title Insurance Issued by Chicago Title, Dkt 27-2, at 24. "Unmarketable Title" is defined in both policies as "Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title." Owner's Policy of Title Insurance Issued by Stewart Title, Dkt 27-2, at 8; Owner's Policy of Title Insurance Issued by Chicago Title, Dkt 27-2, at 25.

In Idaho, the test for marketability "is not whether title ultimately might be adjudged

free of defects. Rather, it is 'whether a reasonably prudent [person], familiar with the facts and apprised of the question of law involved, would accept the title in the ordinary course of business.'" *Brown v. Yacht Club of Coeur d'Alene, Ltd.*, 722 P.2d 1062, 1065 (Idaho Ct. App. 1986) (quoting 77 AM. JUR. 2D *Vendor and Purchaser* § 132, at 316 (1975)). What a reasonable person would do is a question of fact.

The Mundens argue that Bannock County's claims, if true, would make their property unmarketable. Essentially, Bannock County's ability to limit four-wheeled vehicles' access in and out of their property for several months of the year "severely restricts the ingress and egress" onto their land. Dkt. 38, at 8. Such limitations "make it impossible or highly unlikely that the Mundens will be able to sell their property to a prospective purchaser," that "any prospective buyer will be able to obtain financing for the purchase, and that any title insurer will provide title insurance." *Id*. In response, Defendants argue that the Mundens have offered no evidence that their title is unmarketable, merely speculation. Dkt. 39, at 9; Dkt. 32, at 13.

The Court finds that the Mundens have offered a sufficient rationale that a reasonable person *might* find the title to be unmarketable—sufficient enough to raise a question of fact. Because Bannock County's complaint reveals an arguable potential for liability under Covered Risk 3 of the insured's policies, the Defendants' duty to defend is triggered by Bannock County's complaint, unless an exclusion or exception from the Covered Risks applies.

### 2. Applicability of Stewart Title's Exceptions to the Underlying Action

As previously shown, the Stewart Title policy states, in capital letters, that the

Covered Risks are insured "SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS." Owner's Policy of Title Insurance Issued by Stewart Title, Dkt 27-2, at 12. Stewart Title relies on the contract language to assert affirmative defenses in response to Plaintiffs' motion for partial summary judgment. It argues that even if a Covered Risk would normally be covered by its contract with the Mundens, four policy provisions contained in Schedule B—General Exceptions 2–4 and Special Exception 4—show that Bannock County's claims against the Mundens are expressly excluded from the policy coverage.

Schedule B of the Stewart Title insurance title policy states in bold font that "[t]his policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of . . ." before listing a number of general and special exceptions. Owner's Policy of Title Insurance Issued by Stewart Title, Dkt 27-2, at 12. Stewart Title asserts that it has no duty to defend or indemnify Plaintiffs against Bannock County's claims in the Underlying Action because the claims fall under Schedule B's General Exceptions 2–4. The General Exceptions exclude coverage for:

2) Any facts, rights, interest, or claims which are not shown by the public records, but which could be ascertained by an inspection of the land or by making inquiry of persons in possession thereof.
3) Easements, liens, or encumbrances, or claims thereof, which are not shown by the public records.
4) Discrepancies, conflicts in boundary lines, shortages in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

*Id*. "Public Records" is defined under section (i) of the Definition of Terms in the Stewart

Title insurance title as:

> (i) "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land Is located.

*Id*. at 8.

Stewart Title contends that General Exceptions 2–4 all exclude coverage for the Underlying Action because Bannock County's claim that Garden Creek Road is a public road is not shown by the "public records" as defined by the title insurance policy. Stewart Title interprets "public records" to mean "documents affecting real property [that] identify the property affect[ed] and [are] recorded with the recorder to provide constructive notice to subsequent purchasers and mortgagees" in accordance with Idaho Code section 55-811. Dkt. 33, at 6. Stewart Title cites to *Hon Realty Corp. v. First American Title Ins. Co.*, 291 F. Appx. 951, 953 (11th Cir. 2008) (unpublished) in support of its interpretation. Stewart Title argues that because ordinances and county roadmaps are "not filed with the County Recorder to provide constructive notice to purchasers for value," they are not public records. Dkt. 33, at 6–7. Therefore, General Exceptions 2–4 apply and Stewart Title has no duty to defend or indemnify the Mundens in their dispute with Bannock County.

In response, the Mundens contend that Bannock County's claim that Garden Creek Road is a public road is shown by the "public record" in two ways. First, they argue ordinances which are "'published' in accordance with Idaho Code section 31-715, which provide the public notice and codification requirements for a county ordinance" are public

records providing constructive notice to purchasers in matters related to real property. Dkt. 38, at 11. Second, the Mundens argue Idaho Code section 31-715A (2), "which provides for the publication of ordinance affecting 'real property,' either by stating the legal description in the published ordinance, or 'substituted' by map," is also a public record providing constructive notice. *Id*. The Mundens further argue that *Hon Realty Corp.* can be distinguished from this case and cites instead to the Black Law Dictionary to support their contention that the contract's definition of "public record" "could refer to any 'state statute' that provides any such 'constructive notice.'" Dkt. 38, at 11.

In *Hon Realty Corp.*, the parties disputed whether the term "public records" used in a similar exclusion provision of a title insurance contract included public records that were not filed pursuant to Florida Statute section 695.11, the state's recording statute for encumbrances and liens against real property. 291 F. Appx. at 952. In that case, the "public record" at issue was an enforcement order available in the Miami City's public records. The Eleventh Circuit considered whether the insurance contract's provision that covered encumbrances "recorded in the public records" would include Miami City's public records or only the "Official Records" described in the state's recording statute. *Id*. at 952–93.

In Florida, as in Idaho, state law construes insurance policy exclusions narrowly and resolves ambiguity against the drafter (i.e., the insurance company). However, the Eleventh Circuit ruled in favor of the title insurance company because it found the insurance policy exclusion unambiguously applied to the facts of the case. There, as here, the title insurance contract defined "public records" as follows: "records established under state statutes at Date of Policy *for the purpose of imparting constructive notice of matters related to real*

*property to purchasers for value and without knowledge.*" *Id.* at 953 (emphasis in original). The Eleventh Circuit found it was "clear that the 'public records' definition contemplated only the inclusion of those records filed under a state recording statute and not those general public records that may be available from, for example, a public records request with the state or a local municipality." *Id.* It reasoned that a state statute "granting the local government the authority to issue and enforce local ordinances has nothing to do with a record filed under a statute *for the purpose of* imparting constructive notice of matters related to real property. . . ." *Id.* at 954. (emphasis in original). Rather, such statutes "provide a mechanism for enforcing local ordinances and not a mechanism for imparting constructive notice of matters related to real property." *Id.*

Other cases are also relevant. In *Haw River Land & Timber Co. v. Lawyers Title Ins. Corp.*, the Fourth Circuit interpreted what "public records" meant in a similar title insurance case. 152 F.3d 275, 280 (4th Cir. 1998). In that case, the insurance policy defined public records to mean "records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge." *Id.* at 280. In North Carolina, conveyances of land, contracts and options to convey land, leases over three years, and mortgages and deeds of trusts were required to be recorded in the county commissioner's register of deeds in order to be effective against lien creditors or purchasers for value. In addition, liens, encumbrances, and other matters affecting specific parcels of real property could be recorded against the property in compliance against state statue in a "Record of Lis Pendens," *see* N.C. Gen. Stat. § 1-117; a "judgment docket" or book, *see* N.C. Gen. Stat.

§§ 1-234 through 1-237, 1-208.1, 43–45; and a "Book of Wills," *see* N.C. Gen. Stat. § 31–20. *Id*. North Carolina courts had "clarified that the purpose of these North Carolina recording provisions is to establish a 'single reliable means for purchasers to determine the state of the title to real estate,' and to impute constructive notice only of 'all duly recorded documents that a proper examination of the title would reveal.'" 152 F.3d at 280. (quoting *Stegall v. Robinson*, 344 S.E.2d 803, 804 (N.C. App. 1986)).

The Fourth Circuit held that "public records," as defined by the title insurance policy, only included records recorded in the county commissioners' register of deeds, in a Record of Lis Pendens, a judgment docket, or a Book of Wills. *Id*. The *Haw River* court reasoned that as "the purpose of title insurance is to insure that there are no defects in the legal title to the real property interests being insured, the adverse impact of zoning ordinances and regulations would be covered only if they somehow affected title to specific property as it appeared in state established records putting persons on legal notice about matters affecting that property." *Id*. at 280–81. "Thus, in North Carolina as elsewhere, zoning or environmental laws of general application, which are not recorded against specific parcels of property, are generally excluded from standard-form . . . . title insurance policies." Further, were the Fourth Circuit to hold, "contrary to the language of the title policy in question, that the inclusion of the town ordinances of general application maintained in minute books located in the office of the register of deeds would have the same effect as matters recorded against specific property," it would frustrate the state's public policy that purchasers have a "reliable means for purchasers to determine the state of the title to real estate" in addition to the intent of the title insurance policy. *Id*. at 281

(internal quotation marks and citations omitted).

Other district courts have addressed what "public records" means under similar title insurance definitions. For instance, in *Seilham v. Commonwealth Land Title Ins. Co.*, the Eastern District of Louisiana held that an easement whose creation "was not dependent upon an express declaration in an act of sale, nor . . . . identified in a survey recorded in the public records," and did not appear in the chain of title fell under the title's exception from coverage of "easements, or claims of easements, not shown by the public records." 360 F. Supp. 3d 412, 425 (E.D. La. 2018); *see also Chicago Title Ins. Co. v. Rogers*, No. 2:07-CV-117, 2009 WL 10664663, at *5 (N.D. Ga. Feb. 6, 2009) (holding that under Georgia's recording statutes, a party acquiring title is charged with constructive knowledge of what a search of the title records would reveal, but general public records such as a notice of violation did not "give constructive notice of matters affecting" a person's real property title.). In arriving at its decision, the *Seilham* court quoted a title insurance law treatise in support of its determination that the standard form exception to covering easements not recorded in public records "is intended to insulate title insurers from losses resulting from easements that were created as a matter of law and by prescription or implication and that cannot be discovered from a standard search of the public real property records." *Seilham*, 360 F. Supp. 3d at 425 (quoting Joyce Palomar, Title Insurance Law § 7:12 (2017)).

The Mundens argue *Hon Realty* is inapplicable to this case for two reasons. First, the violation at issue in *Hon Realty* was only available via a public records request whereas here the county maps and relevant ordinance were publicly available. Dkt. 38, at 11. The Court disagrees that this is a relevant factual distinction. As seen in *Haw River*, *Chicago*

*Title Ins. Co.*, and *Seilham*, the relevant fact is whether the record is shown in the chain of title, not whether the public could access the record without a records request. Second, the Mundens argue the Florida statute relied on in *Hon Realty*, Fla. Stat. section 695.11, "*has little to no similarity*" to Idaho Code section 55-811. Dkt. 38, at 11. They contend that Idaho Code section 55-811 is limited to "constructive notice" of "conveyances of real property." *Id*. However, Fla. Stat. section 695.11 falls under Chapter 695 "Record of Conveyances of Real Estate" within Title XL "Real and Personal Property" and records filed in compliance with Fla. Stat. section 695.11 "shall be notice to all persons." Fla. Stat. § 695.11. The Court is uncertain what the Mundens mean when they state the statutes share little to no similarity as they are both recording statutes for real property that provide constructive notice to purchasers.

Although the "public policy" definitions in *Haw River*, *Chicago Title Ins. Co.*, and *Seilham*, and *Chicago Title Ins.*, were similar—if not identical—to the one at issue here, all of those cases turned on the interpretation of other states' statutes. The Court therefore reviews the relevant Idaho recording statute.

Idaho's statutes for recording the transfer of property are found in Chapter 8 of Title 55. In Idaho, "[t]he primary purpose of the recording statutes is to give notice to others that an interest is claimed in real property." *Kalange v. Rencher*, 30 P.3d 970, 974 (Idaho 2001) (internal citations omitted). "Under Idaho's recording statutes, every conveyance of real property acknowledged or proved, and certified and recorded as prescribed by law, is constructive notice of its contents to subsequent purchasers and mortgagees from the time it is filed." *Id.* at 973 (citing Idaho Code § 55-811). "Constructive notice imparted from the

record, therefore, is a matter of statute." *Id*. Idaho's recording statute providing notice for the conveyance of real property is principally Idaho Code section 55-811.

Idaho caselaw has long established that the main purpose of the recording statute was to provide constructive notice "only . . . to subsequent purchasers and incumbrancers" rather than "a publication to the world." *Maxwell v. Twin Falls Canal Co.*, 292 P. 232, 234–35 (Idaho 1930); *see also Large v. Cafferty Realty, Inc.*, 851 P.2d 972, 975–76 (Idaho 1993) ("The purpose and effect of Idaho Code § 55-811 is to protect persons with a recorded claim or lien on the property from claims by other persons who acquire an interest in the property after the interest is recorded."); *Kalange*, 30 P.3d at 974 (The recording statute "compels the recording of instruments affecting title, for the ultimate purpose of permitting purchasers to rely upon the record title" by giving notice to potential buyers and "protection against *bona fide* third parties who may be dealing in the same property".)

The parties expressly and unambiguously excluded coverage for easements not shown in public records from the title insurance policy. They generally defined public records as those "established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge." Owner's Policy of Title Insurance Issued by Stewart Title, Dkt 27-2, at 8. In Idaho, public records, as defined by the title insurance policy, would be those that are established under Idaho Code section 55-811. The public record definition does not extend to general public records such as a county road maps. Further, the Court agrees with the Eleventh Circuit that a state statute that grants the local government the authority to issue and enforce local ordinances has nothing to do with a record filed under a statute

"*for the purpose* of imparting constructive notice of matters related to real property. . . ." In the same vein, Idaho Code section 40-202, which that establishes that highways used and maintained by the public for five years are public highways, is not a public record— and does not produce records—as defined by the policy. While the Idaho Supreme Court held in *Ada County Highway District* that Idaho Code section 40-202 provides notice of an easement to owners (and potential purchasers) of real property, it did so "based upon the principle that persons are charged with constructive knowledge of the statutes and laws," not because the Idaho Code section 40-202 itself generates a record that is filed under a statute for the purpose of imparting constructive notice of matters relating to real property. 179 P.3d at 334 (quoting *Powers*, 703 P.2d at 1345).

Stewart Title is not contractually obligated to indemnify and defend the Mundens' title relating to their dispute with Bannock County over whether the Garden Creek Road was established as a public road prior to Mundens' purchase of the property. The notice of such easement is not recorded as a public record as defined by the policy. The Court denies the Mundens' motion for partial summary judgment with respect to Stewart Title.

### 3. Applicability of Chicago Title's Exceptions to the Underlying Action

Chicago Title also relies on its Schedule B provisions exempting coverage— Exceptions 1 and 3—to assert an affirmative defense to the Mundens' motion for partial summary judgment. Schedule B states:

> This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses which arise by reason of . . .
> 1. Rights or claims of parties in possession not shown by the public records. . . .
> 3. Easements, or claims of easements, not shown by the public records.

Owner's Policy of Title Insurance Issued by Chicago Title, Dkt 27-2, at 29. Exception 3 under the Chicago Title insurance policy is the same as General Exception 3 under the Stewart Title insurance policy. Additionally, Chicago Title's insurance policy's definition of "Public Records" is identical to Stewart Title's insurance policy's definition. *Compare* Owner's Policy of Title Insurance Issued by Chicago Title, Dkt 27-2, at 25 *with* Owner's Policy of Title Insurance Issued by Stewart Title, Dkt 27-2, at 8.

Because the relevant contract language is identical under both the Stewart Title and Chicago Title insurance policies, the Court finds that Chicago Title is also not contractually obligated to indemnify and defend the Mundens in the Underlying Action. It is contractually exempted from providing coverage for disputes concerning easements that are not shown in public records established under Idaho Code section 55-811. Accordingly, the Court denies the Mundens' motion for partial summary judgment with respect to Chicago Title.

## C. Stewart Title's Motion for Summary Judgment

The Court independently reviews the record but relies on the same legal reasoning in deciding Stewart Title's motion for summary judgment as it did in denying the Mundens' motion for partial summary judgment. Even construing all facts in the Mundens' favor, the Court still finds as a matter of law that the Mundens cannot prevail on their claims for declaratory relief, defense and prosecution of action, indemnification, and breach of contract because the disputed easement is not found on the public record, as defined by the title insurance policies. The Court grants Stewart Title's motion for summary judgment.

**D. Chicago Title's Motion for Summary Judgment**

As previously established, the Court reviews Chicago Title's motion to dismiss under a motion for summary judgment standard. For the same reasons as stated above, the Court grants Chicago Title's motion for summary judgment.

## E. ORDER

It is HEREBY ORDERED:

1. Defendant Chicago Title's "Motion to Dismiss" (Dkt. 8) is **GRANTED**.

2. Plaintiffs Dennis and Sherrilyn Munden's Motion for Partial Summary Judgment (Dkt. 27) is **DENIED**.

3. Defendant Stewart Title's Motion for Summary Judgment (Dkt. 34) is **GRANTED**.

4. This case is dismissed in its entirety and closed.

5. A separate judgment will be issued.

DATED: March 11, 2020

David C. Nye
Chief U.S. District Court Judge