UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DENNIS L. MUNDEN and SHERRILYN L. MUNDEN, husband and wife, residing in Bountiful Utah,<br><br>                Plaintiffs,<br><br>v.<br><br>STEWART TITLE GUARANTY COMPANY, a Texas surety; and CHICAGO TITLE INSURANCE COMPANY, an Illinois surety,<br><br>                Defendants. | Case No. 4:19-cv-00112-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is the Defendant Chicago Title Insurance Company's Motion for Summary Judgment (Dkt. 63) and Plaintiffs Dennis L. and Sherrilyn L. Munden's Cross-Motion for Summary Judgment (Dkt. 66). The Court held oral argument on April 3, 2022, and took the Motions under advisement. For the reasons stated below, the Court DENIES the Motions in PART. The case is STAYED pending the resolution of the ownership of the Upper Garden Creek Road.

## II. BACKGROUND

On January 17, 2006, Bannock County, Idaho passed County Ordinance 2006-1, designating multiple roads and trails—including the Upper Garden Creek Road at issue in this proceeding—as part of the Scout Mountain Loop snowmobile trail. The ordinance prohibited vehicular traffic, except for snowmobile traffic, on the designated roads and

trails during the winter season.

On or about January 18, 2012, the Mundens purchased property in Bannock County consisting of approximately 768 acres of agricultural land ("North Garden Creek property"). The Mundens obtained an insurance policy from Stewart Title Guaranty Company in the amount of $600,000 for indemnification and defense against any covered claims against title to the North Garden Creek property.

Around August 14, 2014, the Mundens purchased an additional 660 acres of agricultural land in Bannock County ("South Garden Creek property"). The Mundens obtained a policy from Chicago Title in the amount of $406,700 for indemnification and defense against any covered claims against title to the South Garden Creek property.

On January 8, 2019, Bannock County amended Ordinance 2006-1 by passing Ordinance 2019-01. Ordinance 2019-01 provides that "snowmobile trails shall be closed . . . at the discretion of the County Public Works Director," rather than closed for a fixed timeframe of "between December 15 of each year and April 15 the succeeding year," as Ordinance 2006-1 stated. *Id*. at 37, 40. Ordinance 2019-01 went into effect after it was published on January 13, 2019. *Id*. at 40–41.

Upper Garden Creek Road runs through the Mundens' North Garden Creek and South Garden Creek properties. The Mundens maintain they can access their South Garden Creek property through another public road that runs along the edge of the property, but contend they can only access their North Garden Creek property via Upper Garden Creek Road. Dkt. 52, at 14:2–9, 15:1–4.

After Bannock County passed Ordinance 2019-1, the Mundens filed an action in

MEMORANDUM DECISION AND ORDER - 2

Idaho's Sixth Judicial District, seeking an injunction and other relief against Bannock County for its actions affecting the use of their property.

On February 7, 2019, the Mundens sent a notice of claim to Stewart Title and Chicago Title stating that they must defend and indemnify the Mundens in the state case from claims being made by Bannock County regarding the ownership of Upper Garden Creek Road. The Mundens asserted Bannock County's claims regarding Upper Garden Creek Road affected the value and marketability of their title to the North Garden Creek and South Garden Creek properties. Stewart Title and Chicago Title both denied the Mundens' notice of claims.

On March 11, 2019, Bannock County filed counterclaims in the state case. Three of Bannock County's counterclaims are based on its contention that Upper Garden Creek Road is a public road of record. The state case is still pending,[1] and the Mundens allege they have incurred costs in defending against Bannock County's counterclaims and have suffered losses from the restrictions placed on the use of Upper Garden Creek Road by Bannock County. The Mundens dispute that Upper Garden Creek Road was a public road prior to their purchase of the property.

On April 4, 2019, the Mundens filed the instant action, asserting claims for declaratory relief, defense and prosecution, indemnification, and breach of contract. Dkt. 1.

Chicago Title filed a Motion to Dismiss for failure to state a claim on May 8, 2019.

---

[1] In the state case, the Idaho Supreme Court remanded the case back to the district court. *Munden v. Bannock County*, 504 P.3d 354 (Idaho 2022).

MEMORANDUM DECISION AND ORDER - 3

Dkt. 8. On July 11, 2019, the Mundens filed a Motion for Partial Summary Judgment. Dkt. 27. Stewart Title filed its own Motion for Summary Judgment on August 14, 2019. Dkt. 34. The Court ultimately granted Chicago Title's Motion to Dismiss and granted summary judgment in favor of Stewart Title, finding Upper Garden Creek Road was not in the "public records" and therefore the title companies did not have a contractual obligation to indemnify and defend the Mundens' title. See generally Dkt. 46.

On the Mundens' appeal, the Ninth Circuit affirmed the Court's grant of summary judgment to Stewart Title, reversed as to Chicago Title, and vacated the Court's judgment in favor of Chicago Title. *Munden v. Stewart Title Guar. Co.*, 8 F.4th 1040 (9th Cir. 2021). The Ninth Circuit held that the county maps were "public records" based on the plain language analysis of Idaho Code section 40-202(2), (3), and (6). *Id.* at 1049. But the Circuit found that the public interest in the road crossing the Mundens' property triggered a policy exclusion[2] and Stewart Title accordingly had no obligations to defend the Mundens in the state case. *Id.* at 1050. Because the Chicago Title insurance policy did not contain similar language, the Ninth Circuit reversed the Court's judgment in favor of Chicago Title.

On January 21, 2022, following the Ninth Circuit's decision, Chicago Title sent a letter accepting coverage under the policy. Dkt. 63-2, at 6–8. In June of 2022, Chicago Title issued payments of $49,915.61 and $86,428.38 to the Mundens as reimbursement for legal fees accrued in the underlying state action, this case, and the appeal. Dkt. 63-2, at 38–

---

[2] "Special Exception 4 in Stewart Title's policy created an exclusion "aris[ing] by reason of . . . [r]ight, title, and interest of the public in and to those portions of the above described premises falling within the bounds of roads or highways." *Munden*, 8 F.4th at 1049.

40, 46–47. Chicago Title also issued a payment for $4,000, representing the value of the property loss as established by the diminution in value appraisal. Dkt. 63-3.

On December 6, 2022, Chicago filed the instant Motion for Summary Judgment, arguing it has fulfilled all demands and there is no longer an active dispute over the facts or any need for trial. Dkt. 63-1. On January 4, 2023, the Mundens responded and simultaneously filed a Cross-Motion for Summary Judgment. Dkt. 66-3. The Mundens contend the damages paid by Chicago Title were insufficient under the Policy because a cloud on their title to the South Garden Creek Property still exists. Dkt. 66, at 2. The Mundens argue Chicago Title has not fully compensated them for damages covered under the Policy and has also not fully compensated them for the attorneys' fees and costs to which they are entitled under the Policy. *Id*.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (cleaned up). In considering a motion for summary judgment, the Court must "view the facts in the non-moving party's favor." *Id*. To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in his or her favor." *Id*.

Accordingly, the Court must enter summary judgment if a party "fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that preclude summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

When cross-motions for summary judgment are filed, a court must "rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (cleaned up). In doing so, a court must independently search the record for factual disputes. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment—where all parties essentially assert that there are no material factual disputes—does not end a court's responsibility to determine whether disputes as to material fact are present. *Id*.

## IV. ANALYSIS

Here, the cross-motions for summary judgment involve the interpretation of the Policy and the rights and coverage the Policy provides.

### A. Policy Interpretation under Idaho law

In Idaho, whether an insurance policy is ambiguous "is a question of law." *McFarland v. Liberty Ins. Corp.*, 434 P.3d 215, 219 (Idaho 2019) (cleaned up). A court

begins with the policy's "plain language" and "determines whether or not there is an ambiguity." *Id*. (cleaned up). A provision is ambiguous if it "is reasonably subject to differing interpretations." *Id.* (cleaned up).

Idaho prescribes several rules for interpreting insurance policies. First, clear language in the policy is "given its plain and ordinary meaning." *Id.* (cleaned up).

There is a presumption that "common, non-technical words are given the meaning applied by laymen in daily usage—as opposed to the meaning derived from legal usage," but that presumption is rebutted if "a contrary intent of the parties is shown." *Id.* (cleaned up). Examining reference materials helps in determining that usage. *Id.* at 220–21 (referring to a "survey of multiple dictionaries," such as Webster's Third New International Dictionary and the Oxford English Dictionary). Lay usage can accommodate more than one reasonable meaning for a term or provision. *See id.* at 222 (holding that both "place of residence" and "house" are reasonable interpretations of the term "dwelling," as commonly understood).

A policy's failure to define a specific uncommon, technical term, while defining other uncommon technical terms, "weighs in favor of ambiguity." *Id.* at 219 (cleaned up). But the "mere fact that a term is undefined in a policy does not make that term ambiguous if it has a settled legal meaning" in Idaho. *Id.* (cleaned up).

The court "must construe the policy as a whole, not by an isolated phrase." *Id.* at 222 (cleaned up). In particular, if an isolated term or provision appears initially ambiguous, "reading the policy as a whole can remove the ambiguity by rendering one of the possible interpretations unreasonable." *Id.*

MEMORANDUM DECISION AND ORDER - 7

And "because insurance policies are adhesion contracts not typically subject to negotiation between the parties, all ambiguities in an insurance policy are to be resolved against the insurer." *Id.* at 219 (cleaned up). The insurer has the burden "to use clear and precise language if it wishes to restrict the scope of coverage," and "exclusions not stated with specificity will not be presumed or inferred." *Id.* (cleaned up). Thus, if there is an ambiguity, there is no factfinding of the parties' actual intent in drafting the language. *Id.* at 223 (construing the ambiguous term "dwelling" by choosing the reasonable interpretation most favorable to the insureds).

To summarize Idaho's procedure for interpreting insurance policies: (1) give any expressly defined terms their defined meaning; (2) give any clear provisions their plain, ordinary meaning; (3) if an uncommon, technical term is undefined in the policy but has a settled legal meaning in Idaho, give the term that settled legal meaning; (4) give each undefined common, nontechnical term a meaning in daily usage by laymen, and (5) all remaining terms are ambiguous; choose a reasonable meaning for each such term. For steps 4 and 5, the meanings selected should produce the interpretation most favorable to the insured but still reasonable in light of the policy as a whole.

**B. Chicago Title's Motion (Dkt. 63)**

Chicago Title suggests summary judgment is appropriate because all claims by the Mundens have already been resolved and there are no issues left for trial. Specifically, it is undisputed that after the Ninth Circuit's remand, Chicago Title accepted the Mundens' title insurance claim, remitted payment for the loss in value of the property, and reimbursed the Mundens for the legal fees they incurred in litigating their property rights. The Mundens

counter that although Chicago Title has compensated them for much of the attorney fees they have incurred thus far, it has not compensated them for the complete amount of damages covered under the Policy. Dkt. 66, at 2. The Mundens contend such damages, including an unmarketable title, well exceed the $406,700 of coverage under the Policy. *Id.*

*1. Compensation for Unmarketable Title*

Title insurance "is the certification or guarantee of title or ownership, or insurance of owners of property or others having an interest therein or liens or encumbrances thereon, against loss by encumbrance, or defective titles, or invalidity, or adverse claim to title." Idaho Code § 41-508(1). "The purpose of title insurance is to protect a transference of real estate from the possibility of a loss through defects that may cloud the title." *Brown's Tie & Lumber Co. v. Chicago Title Co. of Idaho*, 764 P.2d 423, 427 (Idaho 1988) (quoting 9 Appleman, Insurance Law and Practice § 5201, 8–9 (1981)).

In Idaho, the test for marketability of title "is not whether title might ultimately be adjudged free of defects. Rather, it is whether a reasonably prudent person, familiar with the facts and apprised of the question of law involved, would accept the title in the ordinary course of business." *Brown v. Yacht Club of Coeur d' Alene, Ltd.*, 722 P.2d 1062, 1065 (Idaho Ct. App. 1986) (cleaned up). "Applying this test to a fact pattern creates a mixed issue of law and fact." *Id.*

Whether the Mundens have unmarketable title is an unresolved question, and until ownership of the Upper Garden Creek Road is established, this Court can determine neither whether Chicago Title has fully compensated the Mundens, nor the appropriate amount of

MEMORANDUM DECISION AND ORDER - 9

compensation. As the Idaho Supreme Court noted in the state case, the crux of the Mundens' complaint was a determination of the status of the Upper Garden Creek Road. *Munden v. Bannock Cty.*, 504 P.3d 354, 375–76 (Idaho 2022). The court "concluded that the Mundens were obliged to comply with Idaho Code section 40-208(7) and bring a petition before the Bannock County Commissioners before they could bring suit in Idaho district court." *Id.* at 375–76. The requirement under the Idaho statute establishes the procedure to determine whether Upper Garden Creek Road is privately owned or owned by Bannock County. If the Upper Garden Creek Road is privately owned by the Mundens, no cloud on title exists, rendering any compensation for the "defect of title" inappropriate. Alternatively, if Upper Garden Creek Road is a public road owned by Bannock County, then this Court can determine whether the compensation paid by Chicago Title based on the diminution of value appraisal fulfilled Chicago Title's contractual obligation under the Policy. This Court will stay a decision on whether the Mundens have been appropriately compensated until a final determination is made regarding the ownership of Upper Garden Creek Road according to Idaho Code section 40-208(7). *See Sarkar v. Garland*, 39 F.4th 611, 617 (9th Cir. 2022) (cleaned up) ("Federal courts have inherent power to control the disposition of the causes on their dockets."); *see also* Fed. R. Civ. P. 1.

    *2. Reimbursable Legal Fees*

    Chicago Title argues summary judgment is appropriate with respect to legal fees owed under the Policy because it compensated the Mundens for the attorneys' fees they incurred in the state case, this proceeding, and the appeal, and there is therefore no dispute regarding fees. The Mundens argue Chicago Title has not paid the full amount owed under

the Policy. Ultimately, the Court will deny Chicago Title's Motion on this issue because there is a dispute about the total amount of legal fees Chicago Title owes the Mundens.

Condition 5(a) in Chicago Title's Policy, labeled "Defense and Prosecution of Actions," states:

> Upon written request by the Insureds, and subject to Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. . . . The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of actions that allege matters not insured against by this policy.

Dkt. 1-4, at 10. When Chicago Title issued payment for legal fees, it explained in the letter accompanying the check what itemized amounts were excluded from the payment because they fell outside the scope of coverage. Dkt. 63-2, at 34–36. For instance, Chicago Title did not reimburse the Mundens for legal fees they incurred before tendering their claim to Chicago Title on February 11, 2019, which included $14,680 in fees the Mundens incurred between January 10, 2019, and February 6, 2019. *Id.* After outlining various fees not covered under the Policy, Chicago Title paid the Mundens a total of $49,915.16 for fees they incurred litigating the state case. Additionally, Chicago Title paid the Mundens $86,418.38 in fees for the instant case and the Ninth Circuit appeal.

In response, the Mundens argue they are entitled to a total of $147,433 in fees and costs (minus the $49,915.16 Chicago Title already paid) but do not address the reasons Chicago Title provided for excluding coverage of certain amounts. Dkt. 66, at 5; Dkt. 66-4, at 3. The Mundens resubmitted previous exhibits showing itemized expenses, including

MEMORANDUM DECISION AND ORDER - 11

expenses incurred on a range of dates Chicago Title maintains are not reimbursable under the policy. Dkt. 66-1. The Mundens do not offer any argument or explanation to suggest such fees are covered under the Policy.

"The duty of an insurer to defend its insured is much broader than its duty to indemnify and 'arises upon the filing of a complaint whose allegations, in whole or in part, read broadly, reveal a potential for liability that would be covered by the insured's policy.'" *Scout, LLC v. Truck Ins. Exch.*, 434 P.3d 197, 202–03 (Idaho 2019) (cleaned up). "So long as there exists a genuine dispute over facts bearing on coverage under the policy or over the application of the policy's language to the facts, the insurer has a duty to defend." *Id*. "In making a determination of coverage, 'an insurer does not have to look beyond the words of the complaint to determine if a possibility of coverage exists." *Id.*

In reading the language of Condition 5, the Policy provides that the Insurer will *defend* against actions filed against the insured by a third party. Dkt. 1-4, at 10. Here, because the Mundens initiated the state case against Bannock County, it was only when Bannock County filed a counterclaim that Chicago Title's duty to defend was triggered. Any fees incurred before Chicago Title's duty to defend was triggered are not covered under the Policy.

Chicago Title next points to Condition 5(c), which provides that the insurance company may "in its sole discretion" appeal an adverse judgment. Dkt. 63-2, at 35. Chicago Title asserts that because the Mundens chose to appeal in both the state case and present case and Chicago Title did not have a role in that decision, legal fees incurred for those appeals were unauthorized and therefore, outside the scope of reimbursable fees. Under the

MEMORANDUM DECISION AND ORDER - 12

plain language of the Chicago Title Policy, it would seem that Chicago Title is exempted from payment, but the provision must be considered as a whole. *McFarland*, 434 P.3d at 222. Condition 5(c) states:

> Whenever the *Company* brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, *in its sole discretion*, to appeal from any adverse judgment or order.

Dkt. 1-4, at 10 (emphasis added). The plain language requires the Company to act in order to trigger the sole discretion clause. Chicago Title did not defend the Mundens in the state case until the Ninth Circuit ruled that the dispute fell within the Policy and Chicago Title was obligated to accept liability. In order to preserve and defend their claims, the Mundens appealed within the statutorily required time, which occurred before the Ninth Circuit's ruling. The Policy does not contemplate this circumstance or circuitous timing, and therefore, there is an ambiguity regarding whether Chicago Title had the sole discretion to appeal, and, if not, should be liable for the Mundens' appellate fees.

The Court must resolve the aforementioned ambiguity in favor of the Mundens. *McFarland*, 434 P.3d at 219. Alternatively, because Chicago Title did not bring the action or assert a defense on the Mundens' behalf, it could be found that Condition 5(c) does not apply at all, and Chicago Title did not have the sole discretion to appeal. If Condition 5(c) does not apply, there are no other provisions permitting Chicago Title to exclude appellate fees from the Mundens' reimbursable legal fees. Therefore, a material dispute regarding the amount of legal fees owed exists, and the Court denies Chicago Title's Motion for Summary Judgment with respect to attorneys' fees.

MEMORANDUM DECISION AND ORDER - 13

### C. The Mundens' Cross-Motion (Dkt. 66)

The Mundens seek summary judgment based on the inadequacy of the payments issued by Chicago Title, asserting such payments do not fulfill the monetary obligation they are owed under the Policy. First, the Mundens challenge the scope of liability, indicating that under the Policy, Chicago Title was required to compensate them for all losses the unmarketable title resulted in and not just the diminution in property value. Second, the Mundens assert they are entitled to the full value of the Policy because of the current unmarketability of title given the uncertainty regarding ownership of Upper Garden Creek Road.

*1. Compensation for Losses Due to 2019-1 Ordinance*

The Mundens contend Chicago Title is liable for damages to their calving operation that resulted from the 2019-1 Ordinance. Dkt. 66, at 6. The Mundens state that the passing and enforcement of the 2019-1 Ordinance resulted in more than $400,000 in damages to their business because they had to acquire new equipment, purchase new tires, and find alternative winter accommodations for their cattle.

Policyholders may hold the "reasonable expectation" that title insurance will protect them "against the defects in [their] title which appear of record." *Brown's Tie*, 764 P.2d at 427 (quoting 9 Appleman, at 8–9). However, they should hold no expectation that title insurance will guarantee the success of how they intend to use the property. *Id.* ("The business success is not what has been insured, only the title.")

Ultimately, title insurance guarantees the status of property title based on what is recorded in the record as of the date of the policy. *Brown's Tie*, 764 P.2d at 427 (quoting 9

MEMORANDUM DECISION AND ORDER - 14

Appleman, at 8–9). Examples of things in the record affecting a specific property title are easements, liens, encumbrances, and so forth. Chicago Title's policy states that it "insures, *as of Date of Policy* . . . against loss or damage."[3] Dkt. 1-4, at 9 (emphasis added).

The Ninth Circuit ruling established that Upper Garden Creek Road existed in the public records prior to the issuance of the Policy. Chicago Title later accepted the Mundens' insurance claim to compensate them for the defect in title caused by the dispute over ownership of Upper Garden Creek Road. In their own words, the loss now asserted by the Mundens is a result of the 2019-1 Ordinance. Dkt 66-2, at 1. Additionally, the Mundens have calculated the loss to include various business expenses they claim are related to the 2019-1 Ordinance that span from 2019–2021. For example, $232.47 for a "game camera to track snowmobilers" is itemized, but it is unclear how this was a necessary or required expense related to either the litigation or the property dispute. Dkt. 66-2, at 6. Also included in the $400,000 total are legal fees paid for the current and underlying litigation. Despite the fact that reimbursement for such fees has been sent, the Mundens seek reimbursement for legal fees as a separate claim. *Id.*

In addition, the Mundens seek reimbursement for $33,033 they spent on a calving barn. *Id.* The Mundens suggest the calving barn was "never used" because of the "closed road" following the passage of the 2019-1 Ordinance. *Id.* The Mundens chose to build in a location a mile or so down the county road and any inability to use the barn arose years

---

[3] Covered Risks 9 and 10 may be covered after policy issuance in very specific circumstances but are not at issue here by concession of both parties, and therefore, the policy would only insure against losses or damages that arose as of the date of the policy.

after the title insurance policy was issued.

The Policy provides compensation for actual monetary damages resulting from a defect in title at the time of issuance. *See, e.g.*, *U.S. Bank Nat'l Ass'n as Tr. for Truman 2016 SC6 Title Tr. v. Stewart Info. Sys. Corp.*, 2022 WL 17335672, at *3 (D. Nev. Aug. 22, 2022) (quoting *BB Syndication Servs., Inc. v. First Am. Title Ins. Co.*, 780 F.3d 825, 827 (7th Cir. 2015) ("Title insurance is retrospective; it protects the insured from defects in title that arose prior to the effective date of the policy."). The limitations to business operations arising after the issuance of the Policy are outside the scope of the Policy because of subject matter and the timing. Chicago Title is not liable for any business expense losses resulting from an Ordinance passed after the Policy was issued.

*2. Compensation for Unmarketable Title*

The Mundens seek the full value of the Policy because there is a cloud on their title to the South Garden Creek property, rendering it unmarketable, due to the dispute regarding ownership of Upper Garden Creek Road. To support their claim, the Mundens rely heavily on *Jericho State Cap. Corp. of Fla. v. Chicago Title Ins. Co.*, 848 S.E.2d 572 (S.C. Ct. App. 2020).

In *Jericho*, the South Carolina Court of Appeals was asked to determine whether a reservation of a right-of-way on an official county map, authorized by state code and a county ordinance, constituted a defect in, or encumbrance on, the affected land or rendered the land's title unmarketable, triggering coverage under a title insurance policy. *Id.* at 574. The key concern for the *Jericho* court, however, was whether "[t]he Ordinance created a reasonable probability of litigation concerning the title because the right-of-way was

reserved for acquisition, making future condemnation reasonably probable." *Id.* at 578. The court reasoned that the ordinance rendered title unmarketable because of a likely future action and this future action gave rise to a third-party interest in the property. *Id.* Further, the court stated "[a] marketable title is one free from doubt and any reasonable threat of litigation. Unmarketability cannot be based on just any doubt or defect, for almost any title can be flyspecked." *Id.* The court concluded the "Ordinance created a reasonable probability of litigation, thereby making the title unmarketable as a matter of law." *Id.* at 579.

Although *Jericho* similarly involved an ordinance, it is inapposite because the South Carolina Ordinance specifically restricted use to ensure future acquisition, which led to the increased probability of litigation. Nothing within the 2006 or 2019 Bannock County Ordinances establishes rights for future acquisition or threatens the current ownership. The 2019-01 Ordinance only changed the time and manner of road closure and did not alter title to the property. There is nothing to suggest the 2019-01 Ordinance increased the probability of litigation. Litigation was unexpected as Bannock County believed ownership rights of the Upper Creek Garden Road were established. Additionally, there is nothing to suggest that condemnation proceedings have been initiated since the ownership question arose.

The elephant in the room of this litigation revolves around ownership of Upper Creek Garden Road. In Idaho, the proper way for determining or challenging the status of a road is governed by Idaho Code section 40-208(7). The Mundens were made aware of this statutory requirement at least as early as 2019, when Bannock County cited the statute

in their state case counterclaim. Dkt. 27-3, at 29. The required adherence to the statute was reiterated by the Idaho Supreme Court decision issued in 2022. The record does not reflect whether the Mundens have sought a validation proceeding, which would establish the status of the road and could potentially clear the cloud on title. As such, until the latter issue is resolved, a determination of compensation for unmarketable title is premature.

For all of these reasons, the Court will exercise its inherent power over its docket and stay the decision regarding the Munden's compensation for unmarketable title until such time as the ownership of Upper Creek Garden Road is resolved. *See Sarkar*, 39 F.4th 611 at 617; *see also* Fed. R. Civ. P. 1. As for the rest, the Court denies in part the Mundens' Cross-Motion for Summary Judgment (Dkt. 66).

## V. CONCLUSION

Conflicts involving private property rights are common, which is why property owners acquire and rely on title insurance. Title insurers are bound to pay when they miss easements, encroachments, and other claims in the public record affecting an individual's ownership. However, insurance policies only provide compensation for encumbrances and defects that existed at the time of the policy issuance. Title insurers are not bound to compensate for future, unknowable events.

Until the ownership of the Upper Garden Creek Road is determined, decisions regarding possible compensation for title cannot be made. Further, the amount of attorneys' fees owed under the Policy's provisions is a disputed factual question. Therefore, the Court will DENY in part both motions and STAY the issues regarding the ownership of the Upper Creek Garden Road.

## VI. ORDER

The Court HEREBY ORDERS:

1. Defendant Chicago Title's Motion for Summary Judgment (Dkt. 63) is DENIED in PART. A decision on whether the Mundens have been appropriately compensated is STAYED until a final determination is made regarding the ownership of Upper Garden Creek Road according to Idaho Code section 40-208(7).

2. Plaintiffs' Motion for Summary Judgment (Dkt. 66) is DENIED in PART. A decision regarding the Munden's compensation for unmarketable title is STAYED until such time as the ownership of Upper Creek Garden Road is resolved.

DATED: July 31, 2023

David C. Nye
Chief U.S. District Court Judge